*Litchfield,*
June, 1837.

The State
*v.*
Rowley.

---

LANGDON and others *against* THE CONGREGATIONAL SOCIETY in the town of *Plymouth*, and others.

In 1822, certain persons, members of an ecclesiastical society, united in and subscribed their names to a written agreement to raise a permanent fund for the support of the gospel ministry in such society; in which agreement it was provided, that until the subscriptions should become due, the business of the fund should be conducted, by a committee of the subscribers, and afterwards, the whole management should be transferred to the society. At a meeting of the society in *December*, 1836, a majority, in opposition to a large minority, of the members present, voted to return to the original subscribers, or their legal representatives, the sums by them respectively subscribed to the fund; and were proceeding to carry such vote into effect; when some of the original subscribers who were in the minority, in behalf of themselves and all others interested in the fund, brought a bill in chancery against the society and those acting under it, for an injunction, stating the subscription, the object, the terms, the payment of the sums subscribed, an acceptance of the fund, by the society, within a reasonable time, a transfer of it from the committee of the subscribers to the society, by whom it was received and held according to the terms and for

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Congregational
Society.

the purposes specified in the subscription paper, and the attempt of the defendants to break up the fund. On a demurrer to the bill, it was held, 1. that it was sufficient to allege the fact of acceptance within a reasonable time, without shewing a vote or any specific time of acceptance ; 2. that the obligation of the society resulting from such acceptance, transfer and holding of the fund, was sufficiently shewn ; 3. that the society accepted and received this fund subject to the terms prescribed by the donors, *viz.* that it should be a permanent fund, and that it should be applied for the support of the gospel ministry in that society ; consequently, it was a *trust* fund in the hands of the society ; and the society had no right to destroy it, even by returning the property to the original owners. The demurrer was, therefore, overruled.

THIS was a bill in chancery for an injunction, and such other relief as was adapted to the nature of the case.

The bill was brought by *Joel Langdon, Titus Darrow, Allyn Wells, Ransom Blakesley* and *Miles Smith,* for themselves and all other persons, who are subscribers to and interested in a certain fund belonging to the *Congregational Society* in the town of *Plymouth.* It stated, that in the year 1822, the plaintiffs, with a large number of other persons, all of whom were then members of said society, being anxious to promote the welfare of the same, by raising and perpetuating a fund for the support of the gospel ministry therein, united in and subscribed their names respectively to the following written agreement, which they called their "CONSTITUTION": " We, the subscribers, having a desire to promote the welfare of the community, and being reminded, that in many cases, funds are among the best means of promoting that object, and being of opinion that a fund, safely deposited, for the purpose of defraying the annual expense, or some part thereof, of the *Congregational* society to which we belong, would be of great benefit to ourselves and posterity, do covenant and agree,

1st, That our object shall be to raise, for said purpose, the sum of 5000 dollars, or more, up to 8500 dollars.

2ndly, That we hereby affix our names to what proportion of said sum we will respectively pay, provided the subscriptions amount to it.

3dly, That if the amount of the subscriptions falls short of 5000 dollars, we will be holden to pay such a part of the aggregate sums actually subscribed as shall be proportioned to our respective subscriptions.

4thly, That if any subscriber chooses, he may subscribe

such a sum as he will pay, without deduction on account of said aggregate falling short of 5000 dollars.

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Congregational Society.

5thly, That our several subscriptions shall be paid in manner following, *viz.* one fourth part, by the 1st of *January,* 1823, and one fourth part annually thereafter, until completed, each payment being on interest after it becomes due.

6thly, That these payments shall be made to such persons as shall be agreed upon, by the subscribers, and by them be applied to the purchase of bank stock, or be deposited in such a manner as may be thought most secure and permanent.

7thly, That the subscriptions, when paid, together with any additional sum, which may be devoted to the object afterwards, shall be a permanent fund for the support of the gospel ministry in the present *Congregational* society in said *Plymouth.*

8thly, That the interest only of the fund shall be immediately applied for the support of such gospel minister as now is, or hereafter may be, ordained over such society, by the consociation to which it belongs.

9thly, That in case of vacancy of a settled minister, the interest of said fund shall be applied to the principal, for the increase thereof, during said vacancy, until such time as said fund shall amount to 8500 dollars; after which, any interest, more than sufficient for the payment of preaching as aforesaid, may be applied to defray any needful expenses of said society.

10thly, That until the subscriptions shall become due, the business of the fund shall be conducted by a committee of the subscribers, to be chosen annually, on the first *Monday* of *January;* and afterwards, the whole management shall be transferred to the aforesaid society.

11thly. That in all business transactions in any meeting of the subscribers, the vote of each individual shall be considered in proportion to his subscription."

This writing was subscribed, by fifty-one persons, including the plaintiffs, with the sums of money annexed to their names respectively, which they obligated themselves to pay.

The bill averred, that said *Congregational* society did, within a reasonable time thereafter, accept said fund, agreeably to the articles of said writing or constitution; that the fund was, according to the terms of that instrument, transferred to, and committed into the especial trust and management of the socie-

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Con-
gregational
Society.

ty, and has so ever since remained; that it now amounts to the sum of 5443 dollars; that of this amount the sum of 4960 dollars, has been paid to and received by the society; 3400 dollars being vested in thirty-four shares of the stock of the *Phoenix Bank*, standing in the names of *Hiram Pierce*, *Philo Lewis* and *Aaron D. Wells*, as successors to a former committee of the society, who hold said shares in trust for the use of the society; and the balance of said sum of 4960 dollars being loaned out, by the society; that the society has taken the notes of some of the subscribers for their subscriptions, to the amount of 395 dollars, which are now held by the society, or by a fund committee as trustees of the society; and that the sum of 130 dollars of said subscription is now due from the subscribers, and is held by the society, or by the last-mentioned committee, in trust for the society.

The bill further stated, that the plaintiffs and others for whom they sue, relying upon the obligations arising out of said constitution, paid the sums by them respectively subscribed, and the same have been received and are now held, by said society, according to the terms and conditions, and for the purposes, specified in said subscription paper or constitution; that from the time the society received said fund into their possession and controul, they have, in good faith, kept the same, and strictly applied the use thereof according to the terms and provisions of said writing or constitution, *viz.* to the support of the gospel ministry in said society; that there is now settled in said society, as the gospel minister thereof, the Rev. *Ephraim Lyman*, who was settled according to the terms of said writing, and ordained over said society, by the consociation to which said society belongs, and is, at this time, discharging his duties as minister of said society; and said society intend, that he shall so continue to do; that the use of said fund is necessary for the support of said minister; that the plaintiffs and many others of the subscribers to said writing, are, and intend to continue to be, members of said society, and wish to have and enjoy the use of said fund according to the terms, conditions and obligations of said writing, and have never consented that said fund, or any part thereof, should be given up or diverted from the object declared in said writing, and do now protest against any and every act tending thereto; that ten persons of the subscribers to said writing, who to-

OF THE STATE OF CONNECTICUT. 117

gether subscribed the sum of 676 dollars, 50 cents, *viz. Luther Hart, Hall Dunbar, Samuel Camp, Ambrose Barnes, John Allen, Samuel Fenn, Morris Cook, Mary Cook, John Warner,* and *Mary Scovill,* are dead ; that seven persons of said subscribers, *viz. Seth Thomas, Benedict Bull, Allen Bunnell, Thomas Sutliff, Phineas Hitchcock, Henry Terry,* and *Eli Terry,* jun., who are now living, and who together subscribed the sum of 965 dollars, are the only persons of all those who subscribed said writing, who wish, or have ever given their consent, to break up said fund, or to have any portion of it diverted from the object specified in said writing.

The bill further stated, that said society, at a legal meeting, holden on the 12th of *December,* 1836, by the number of 120 in the affirmative, and 105 in the negative, passed the following vote : " Whereas discontents have arisen on the part of many of the subscribers to the fund raised for the support of the gospel ministry in this place, who claim that there have, from time to time, been misappropriations of the same, by this society, and threaten to institute suits against the society in relation thereto ; and whereas others of said society wish to form themselves into a new ecclesiastical society, and appropriate their said subscriptions to the support of the gospel ministry in such new society : now, to prevent all law-suits and controversies respecting said fund, and to enable said subscribers to carry into effect their said wishes, it is

" *Voted,* That the society's committee immediately proceed to the sale of the bank stock standing in their names, and the avails pay over to the fund committee of this society ; and that said fund committee thereupon pay back to the original subscribers, or their legal representatives, the amount of such original subscription as has been paid by them, and return all outstanding notes, which have been given for original subscriptions, and also cancel all original subscriptions that are still due and unpaid." That said society, at said meeting, further voted and empowered either two of said society's committee to transfer said bank stock and to dispose of the same, with or without the consent of the other member, and fully to carry into effect said votes.

The bill then averred, that the reasons set forth in the preamble of the first vote are wholly untrue, except that certain members of the society are desirous of forming a new society,

*Litchfield, June, 1837.*

Langdon v. Plymouth Congregational Society.

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Con-
gregational
Society.

and to leave the existing one, and in order to build up and in-crease their contemplated society, are striving to destroy the ex-isting *Congregational* society, and for that purpose only, a small majority of votes of said society were obtained to pass the votes aforesaid ; that immediately upon the passage of said votes, and to carry the same into execution, and wholly break up and destroy said fund, two of said committee, *viz. Hiram Pierce* and *Philo Lewis,* together with *Willis Atwater,* who is the agent and attorney of said *Congregational* society, have made application to said *Phoenix Bank,* to forthwith cause said thirty-four shares of stock to be transferred, on the books of said bank, to their order, under and in pursuance of said votes, in order that the avails thereof may be delivered to said fund committee, for distribution, as stated in said vote ; that the plaintiffs have reason to believe, and they do believe, that this will be done, unless this court shall interpose to prevent it ; that said committee of said society, or said fund committee, for the purpose of carrying into effect said vote, have already de-livered up to be cancelled to the heirs of *Ambrose Barnes,* to *Benedict Bull, Miles Smith, Truman Cook, Allyn Wells, Lyman Catlin, Phineas Hitchcock* and to *Benjamin Fenn,* the administrator of *Samuel Fenn,* deceased, the notes by those persons respectively given in payment of their respective subscriptions, amounting in the whole to the sum of 440 dol-lars, 70 cents ; which notes were, until the delivery aforesaid, in the possession of said society, or their committees or trustees as aforesaid ; that said committees are about cancelling the subscriptions of *Roger Allen, Mary Cook, Hannah Darrow* and *Hall Dunbar,* by them respectively made, amounting to the sum of 130 dollars, which notes and subscriptions are now a part of said fund, and are held under the terms, conditions and obligations of said writing ; and that the plaintiffs have reason to believe, and do believe, that said acts threatened, by said society, and by said committees, will be committed, and said notes will be delivered up and said subscriptions cancelled, unless this court shall interpose to prevent such acts ; and if said acts are done, there will be an irreparable injury suffered thereby, by the plaintiffs, and by all others for whom they sue.

The plaintiffs, therefore, after averring that they had no re-lief at law, prayed for a decree, that said society, and all its agents, and particularly, *Hiram Pierce* and *Philo Lewis,* who

constitute a majority of the committee of said society, and *Willis Atwater, Tertius B. Potter* and *Josiah C. Usher*, who constitute said fund committee, and said *Atwater*, in his further capacity of agent of said society, shall, all and each of them, cease from any and every act to carry into effect said votes of said society; and particularly, that they shall not, and that said society shall not, by any other agent, sell said bank stock, nor pay the avails thereof to said fund committee, nor to any of the original subscribers to said fund, nor return to any of said subscribers, or to their legal representatives, any notes given for any of said original subscriptions, nor cancel any of said original subscriptions now due and unpaid ; and that said society shall forthwith cause the said notes of said *Fenn, Smith, Bull, Barnes, Cook, Wells, Catlin* and *Hitchcock*, delivered up to be cancelled, as before stated, to be re-delivered and re-transferred to said fund committee, to be henceforth held by them in pursuance of the provisions and stipulations of said writing or constitution ; or if this cannot be done, that said society shall fully make good said fund, so far as the same has been injured, by any of the acts aforesaid ; or in some other way to grant relief.

To this bill there was a general demurrer ; and the case was thereupon reserved for the advice of this court.

*T. Smith* and *L. Church*, in support of the demurrer, contended, 1. That the bill is insufficient, because it does not shew, by sufficient averments, an acceptance of this fund by the society. It does not appear, that any vote was passed on this subject, at a lawful meeting of the society. No vote is set forth, either in *todidem verbis* or according to its legal effect. It does not even appear *when* the acceptance took place, except by the vague allegation that it was in a reasonable time after the fund was completed. What is a reasonable time, is an inference of law from facts stated.

2. That the obligation, if any, which rests upon the society, is created by contract, arising by implication of law from the facts stated. This contract is no where alleged in the bill, but only the evidence of it. This is in substance a bill for a specific performance. *Russell* v. *South-Britain Society*, 9 *Conn. Rep.* 508. *Skinner* & al. v. *Bailey*, 7 *Conn. Rep.* 500.

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Congregational
Society.

Langdon
v.
Plymouth Con-
gregational
Society.

*Hobart* v. *Frisbie* & al. 5 *Day*, 592.    *Bacon* v. *Page*, 1 *Conn. Rep.* 404.

3. That to sustain this bill upon the merits, it will be necessary for the court to infer an agreement, by the society, to and with each of the subscribers, that they will take charge of and administer the fund forever, and appropriate the interest and profits for the purposes specified in the subscription.    It must be assumed, that there was an absolute obligation, to be fulfilled at all events, from which the society could not be released, by any thing short of the assent of every subscriber.    Even though the society might not need the fund, and though it might be a source of unmixed evil to the community and to the cause of religion, they must continue the administration of it, if there be a single obstinate subscriber to resist the wishes of a majority of the society.    The death of a single contributor would place the society in such a condition that it could, by no possibility, be extricated from the embarrassment of such a contract.    It is quite too much to infer such an agreement, by the society, from the facts stated.    The true contract may be stated thus— that the society shall administer the fund, with all due fidelity, according to the stipulations of the subscription paper, so long as they shall have occasion to avail themselves of the benefit. This will impose every proper obligation on the society ; will not tie up the hands of posterity ; and will enable the society to act as circumstances may demand, and to return the subscriptions to the contributors, if the fund is not wanted, or if, from any other cause, that measure becomes expedient.    See *Carter* v. *The First Ecclesiastical Society of Canterbury*, 3 *Conn. Rep.* 455.

4. That this application may be resisted on still higher ground ; for the moment the subscribers gave over their money to the society, and it was accepted, they ceased to have any several interest.    It was a donation to the society.    No one but the society was to be benefitted by it.    Whether it will further promote the welfare of the society, the society has a right to judge, and to dispose of it, at its pleasure.    A corporation may do what it pleases with its funds, provided its legal obligations are discharged ; and the voice of the majority will controul. *Livingston* v. *Lynch* & al. 4 *Johns. Ch. Rep.* 596.

*Butler* and *W. W. Ellsworth*, contra, contended, 1. That it being explicitly averred in the bill, that the society did, within a reasonable time, accept said fund, agreeably to the articles of the constitution, and that it was, according to the terms of that instrument, transferred to, and committed into the especial trust and management of the society, and has so ever since remained, an acceptance is sufficiently shewn. A *vote* of acceptance may be proper evidence of an acceptance in fact ; but the fact being averred, it is not necessary to detail the evidence, or even to mention it.

2. That the society, by such acceptance, became a party to the contract, and assumed the obligations which it purports to impose.

3. That the plaintiffs are entitled to the interposition of a court of chancery in their behalf. The society received this fund *in trust :* it is a mere trustee. As such, it is its duty to manage, but it has no right to destroy or divert the trust estate. *Bailey* & al. v. *Lewis* & al. 3 *Day*, 450. It could distribute it among strangers, as well as return it to the original subscribers.

4. That injunction is the proper remedy. A corporation being a trustee, may be restrained. 2 *Madd. Chan.* 155.

5. That the society, if burdened by the trust, may be relieved, on application to a court of chancery.

WILLIAMS, Ch. J. The plaintiffs seek, by their bill, to procure the interposition of this court, to prevent the destruction of a fund for the support of the ministry in the society, which, they claim, is about to be done, by returning the money subscribed for that purpose to the subscribers and their representatives. The defendants claim, that the society have a right to return the money subscribed for this purpose, when they think it is no longer necessary or useful to the society ; and also, that the facts stated in the bill do not warrant the interposition of a court of chancery.

The first objection to this bill, is, that it does not shew, by proper averments, that the fund was accepted, by the society. It is said, no vote is stated, nor the time of acceptance, unless by the vague allegation that it was in a reasonable time.

The bill alleges, that the plaintiffs and others, being anxious to promote the welfare of the society, by raising and perpetu-

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Congregational
Society.

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Con-
gregational
Society.

ating a fund for the support of the gospel ministry in the society, did unite in and subscribe an agreement, which is set out at large, with the sums subscribed by each person ; by which, they say, they became obligated to pay the same according to the tenor of said writing : further alleging, that said society did, within a reasonable time thereafter, accept said fund, according to the articles of said constitution or writing ; and that the fund, according to the terms of the constitution, was transferred to, and committed into, the especial trust and management of said society, and has so ever since remained, and now amounts to the sum of 4960 dollars ; and a part has been vested in *Phoenix* bank stock, in the name of a committee of said society, and the balance has been loaned by said society.

The objection is, that the vote of acceptance and the time are not shewn. If a vote of the society was necessary to prove an acceptance, it is only evidence of it, and of course, need not be pleaded. The fact of acceptance is alleged ; and that is sufficient. Under that allegation a vote may be shewn as evidence of such acceptance. And if it is not necessary to set forth a vote in the bill, it would seem unnecessary to allege any specific time of acceptance ; as by the constitution of the subscribers, no time was fixed in which it must be done, but merely that after it was done, the whole management should be transferred to the society. At all events, if the society did, within a reasonable time, accept the special trust and management of this fund, and have actually received the avails, it would require some authority to prove, that because the precise time of such acceptance could not be, or was not, pointed out, therefore they could not be called to account for an attempt to misapply it.

The next objection is, that if any obligation rests upon the society, it is created by a contract arising by implication of law from the facts stated ; and that such contract is not alleged in this bill, but only the evidence of it. A little attention to this bill will shew what foundation there is for this objection. The bill states the object of the subscribers to be a permanent fund for the support of the ministry. It then shews the constitution or agreement for the regulation and disposition of said fund ; and that the fund has been transferred to, and received and is now held by, the society, " according to the terms and conditions, and for the purposes, specified in said subscription

paper or constitution ;" and then alleges, that the society are about to violate those conditions, and claims the protection of the court. It would seem that the rights of the plaintiffs were here clearly, though concisely stated, with the obligation of the defendants, and their attempt to violate them. 2 *Sw. Dig.* 203. *Milf. Pl.* 40. *Botsford* v. *Beers*, 11 *Conn. Rep.* 370. 374.

We come, then, to the merits of the case.

The plaintiffs claim, that this fund in the hands of the defendants, is in the nature of a trust fund, to be held, by the society, for the uses and purposes for which it was originally destined, forever. The defendants, on the other hand, claim, that this was a donation to the society, which they had a right to accept or not, and which they may keep or return at pleasure : that when they become rich and do not need it ; or when, in their opinion, it does not promote the peace and welfare of the society, or the objects originally intended ; the society may return it to the donors : that the subscribers gave up their respective individual interests to the society, who, being a corporation, may act by a major vote.

If this fund was a donation to the society, as is claimed, without restriction or condition, the society might return it to the donors, or use it for any other purpose to which they might apply any other property of the corporation. But if it was to be held, as the bill alleges, according to the terms and conditions of the constitution adopted by the subscribers, we must resort to that instrument to determine what are the powers and duties of the society. It shews, that the subscribers, being desirous to promote the welfare of the community, and being reminded that funds were among the best means of promoting that object, and being of opinion that a fund safely deposited for the purpose of defraying the annual expenses of the society to which they belonged, or some part thereof, would be of great benefit to themselves and their posterity, covenanted, among other things, that the money subscribed should be a *permanent fund* for the support of the gospel ministry in the present congregational society in *Plymouth ;* that the interest should be so applied ; that until the subscriptions were due, the business of the fund should be conducted, by a committee of the subscribers chosen annually ; and afterwards, the whole management should be transferred to the society. The object

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Congregational Society.

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Con-
gregational
Society.

in view was the welfare of this community; which, they supposed, would be advanced, by a permanent fund for the support of the ministry; and that it might be permanent, it was provided, that it should be placed in the hands of persons chosen by the subscribers, to be vested in such a manner as might be most secure and permanent. They intended, then, to establish a permanent fund, not for the benefit of this generation merely, but for the benefit of their own families and those who should come after them. It was first to be placed in the hands of a committee elected by the subscribers; which committee had no more beneficial interest in it than any other subscribers. They held it merely to carry into effect the object the subscribers had in view. This committee, then, were merely the agents or trustees of the subscribers, holding these funds to the use and for the purpose designated in the instrument they called a constitution, and could appropriate them to no other objects. But as this committee were to be chosen annually, by the subscribers, who would continually diminish until none remained, it was desirable that this care should devolve upon a more permanent body. It was therefore provided, that after the subscriptions all became due, the whole management should be transferred to the society. The society then were substituted for the former committee; and were to have the powers and perform the duties first imposed upon this committee. If the committee, to whom was first confided the management of this fund, did not thereby become owners of that fund, and could not dispose of it at their pleasure, it is necessary to see how the society, their successors, became the owners, or could dispose of it at their pleasure. The management was confided to each in turn, and nothing but the management: the disposition of the fund was made by the subscribers themselves, and left no discretion to those whom they appointed managers.

It is said, it was given for the benefit of the corporate body; and so they had the legal and the beneficial interest. But was it intended for the benefit of the corporation, as such; or for the good of the individuals composing it or connected with it? In our pecuniary corporations the legal estate is in the corporate body; but they hold it for the benefit of the individual stockholders. The corporate body has not all power, and may do acts to the injury of individual stockholders; and if it does, a court of chancery will restrain it.

This corporation having accepted the fund, accepted it, of course, subject to the terms and conditions which the donors had prescribed, *viz.* that it should be permanent; and that it should be appropriated for the uses and purposes intended. And the present managers can have no more right to vary the designation of the money, than the committee originally appointed. Both were the depositaries, not the donees, of the money. The constitution agreed upon, by the subscribers, is as much the rule of action for those who hold the funds given under it, as the constitution of the state is the rule by which the destination of the school fund is secured for the use of common schools. The donors part with their money, upon certain terms and conditions; and those who received it, received it subject to those terms and conditions, and those only. They now indeed say, that those terms and conditions have become ill adapted to the circumstances of the society; that the fund is actually hurtful; and that the subscribers cannot complain, if they receive back their own money. How far the opinion of one hundred and twenty members out of two hundred and twenty-five, would go to prove that the fund was useless, is a question not now necessary to settle. But it is important to know where the society obtained the power claimed. If they were mere donees of the subscribers, and their corporate powers were unlimited, they might possess it. But if the society are mere trustees, or in the nature of trustees, they can have no more right to destroy the trust fund, even by returning the property to the original owners, than other trustees. This mode effects as complete a destruction of the fund as any other; and although it is more just, if the fund is to be destroyed, than any other disposition of it, it remains to be proved that they have the power to destroy it. If an annuity is left by $A$ to $B$, for the use of $C$, $B$ cannot return it to $A$ or his heirs, because $C$ has received an immense estate from another source, or because he expends it in low and vicious indulgences.

It seems to be claimed, that this is done with the consent of the *cestui que trusts* themselves. But the corporate body, a being without a soul, is not the *cestui que trust*. The object of the subscribers was, to confer a benefit on themselves and their children, on each individual member of the society and their posterity, so far as they should remain within the influence of the gospel as there dispensed. Nay further; if, as the

*Litchfield,*
June, 1837.

Langdon
*v.*
Plymouth Congregational
Society.

*Litchfield,*
*June, 1837.*

Langdon
*v.*
Plymouth Con-
gregational
Society.

father of our country has said, religion and virtue are the pillars of society, every person living in the vicinity might have some interest in the support of the gospel in that place; and so might be considered as in some measure interested in the continuance or destruction of this fund. If so, it must follow, that the corporate body could have no right to annihilate it at their pleasure.

It is asked, shall the plaintiffs complain that their own money is to be returned to them? The plaintiffs represent themselves and others interested in the fund; and complain, not merely that their own money is to be forced back upon them, but they are to be deprived of the stipulated benefit of the money of others. They also complain, that there was a solemn contract entered into, by which it was stipulated, that if one of the parties would pay a certain sum, others would also contribute certain sums for an important common object; after which no one had a right to withdraw what he had appropriated, without the consent of all; and he who put in the smallest sum, had no more right than he who subscribed the largest; nor would it give the right because he consented that others should do so too. As the consent of all was necessary to make the contract originally, the consent of all must be necessary to dissolve it; and the court cannot go into the enquiry whether the minority are not as much benefitted, by having their money returned, as by having it used in the manner agreed upon; and if the fund was productive only of evil, as was claimed by one of the counsel, still a part of those interested could not vacate the bargain. Could such a state of facts be proved, it is not necessary to say there could be no remedy. But certainly the individual, whether a natural person or a corporation, who is in the situation of a trustee, although he may have some beneficial interest, is not constituted an umpire to decide this question. A corporation has power, by the vote of a majority, to decide upon all subjects over which they have controul; but they are persons of limited capacities, and when they attempt what is beyond their power, their vote can have no more effect in court, than it is entitled to, by the reasons which produced it. The defendants, then, must shew, that they, as a corporation, possess a power, which the committee in whose hands these funds were first placed had not, before their vote can be obligatory upon all persons interested there-

in ; or that the reasons for that vote are such as will satisfy a court of chancery, that the act done is in itself proper. The court is not satisfied, that they had any such power ; and no facts have been shewn tending to prove, that the fund is useless or injurious. But even were it so, no authority has been produced, to shew, that after such a trust has been accepted, the trustee or those who stand in that relation, can not only relinquish the burthen, but can, at pleasure, annihilate the fund. The authorities, as we think, teach a different doctrine.

In the case of *The Attorney General* v. *Christ's Hospital*, 3 *Bro. Ch. Rep.* 165. 1 *Russ. & Myl.* 626. where an annual sum of 400*l.* was given for the support of six poor children, and in case and as often as the governor of the hospital should refuse or neglect to take in and maintain the number, the money was to be applied to support the same number in such other school or manner as his executor or the corporation should see fit ; it was held, that the defendants having once accepted the legacy, they were forever bound by the condition, whether the receipts were sufficient or not ; although it was contended, that the testator never could have intended to encumber the institution, by the legacy he gave to it. It was there said, as it has been here, shall the defendants be compelled to remain holders of this fund contrary to their mind and will? But if they are trustees, or stand in the relation of trustees, they certainly cannot change that relation at pleasure. No rule is better settled than that trustees cannot, without consent of the *cestui que trust* or a court of chancery, change that relation at pleasure, or discharge themselves of the trust, or " denude" themselves of the trust, as it is sometimes expressed. *Chalmer* v. *Bradley*, 1 *Jac. & Walk.* 68. *Shepherd* v. *McEvers*, 4 *Johns. Ch. Rep.* 136. And this court has decided, that where moneys were given to a society to belong to them to support a free school in the centre district ; and the society, instead of applying it for that purpose, made an agreement with the heirs of the testator, by which they were to receive a certain part of the money and apply it to the support of the gospel ; such an attempt to divert this fund from the object of the testator, was fraudulent and void. *Bailey* & al. v. *Lewis* & al. 3 *Day*, 450. 464. In that case, the fund was given to, and to belong to, the society ; but it

was for a certain object; and the court did not enquire whether a free school was wanted or not, whether the society was unanimous or not, but merely, what was the object for which it was given by him who had the power of designating the object.

But we need no authority but that of our statute. An ancient enactment, still in force, has provided, that when lands, money or other estate are given or sequestered for the use and support of the ministry in any society or congregation in this state, the society may appoint a committee, who shall have power to demand, recover, and receive and take care of all such lands, money or estate for the use of the ministry, according to the true intent of such grant, donation and sequestration. *Stat.* 435. *tit.* 94. *s.* 11. The society, therefore, had nothing to do but to follow the true intent of the subscribers; and the moment they deviated from it, they deviated from the letter of the statute, as well as from the constitution of the subscribers. A return of the money subscribed was no more within the contemplation of those who signed the constitution for a fund, when it was committed to this corporation, than the arrangement made by the society and the heirs was in view of the testator, in the case of *Bailey* v. *Lewis;* and there is no more apology for a violation of that intent, in this case, than in that. The society of *Plymouth,* therefore, when they passed the vote complained of, attempted an act which was to nullify the sequestration of this property, and destroy the very object in view, when the subscribers pledged their faith to each other. Such an attempt is contrary to all the principles which regulate courts of chancery upon such subjects, and in face of our statute, and cannot be countenanced by this court.

If any reasons existed why this fund should be broken up, or the society should no longer remain managers of it, application should have been made to a court of chancery, who would have given such direction as would have comported with the safety of the fund, and its faithful appropriation, and the convenience of the society.

The superior court is advised to overrule the demurrer.

In this opinion the other Judges concurred.

Demurrer overruled.